THE UNITED STATES DISTRICT COURT
THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRYCE L. SPANGLER,

        Plaintiff,

    vs.

CHARLIE WEND, et al.,

        Defendants.

NO.  C12-1196-RAJ-JPD

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

**NOTE FOR 5/31/2013**

The issue of qualified immunity from suit is appropriate for summary judgment. See Anderson v. Creighton, 483 U.S. 635, 646 n.6, 107 S. Ct. 3034, 3042, 97 L. Ed. 2d 523 (1987). Defendants aver that no constitutional right was violated, that no defendant committed a constitutional violation, and that, if anyone did, he or she is entitled to qualified immunity.[1]

---

[1] Under Washington's three year statute of limitation, RCW 4.16.080, Spangler's causes of action are limited to events alleged to have occurred after July 12, 2009. See Taylor v. Regents of the Univ. of Cal., 993 F.2d 710, 711-12 (9th Cir.1993). This effectively restricts Spangler's allegations to events occurring after December 21, 2010, because he was not in jail between July 12, 2009, and that date.

Motion for Summary
Judgment: C12-1196-RAJ-JPD

1

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

1

#### I.      EVIDENCE RELIED ON

2      This motion is based on the following:

3      (1) Declaration of Charles Wend.

4      (2) Declaration of Juanita O'Neill.

5      (3) Declaration of Brian Schrader.

6      (4) Declaration of Todd Hines.

7      (5) Declaration of Ron Coakley, with exhibits.

8      (6) Declaration of Judy Kiesser, with exhibits.

9      (7) Declaration of Ron Kitchener.

10     (8) Document 20-1 filed 9/5/12.

#### II.      AUTHORITY AND ANALYSIS

12          In deciding the defendants' claim of qualified immunity, the court should first

13    determine whether the plaintiff has alleged a deprivation of an actual constitutional right by

14    any specific defendant.[2]  Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818

15    (1999). Then, the court:

16          . . . must determine whether, in light of clearly established principles
            governing the conduct in question, the [official] objectively could have
17          believed that his conduct was lawful.  The standard requires a two part
            analysis: 1) was the law governing the official's conduct clearly
18          established? 2) under that law, could a reasonable official have believed
            the conduct was lawful?

19

20

21    _____

22    [2] In a personal capacity claim, there must be evidence that each defendant "actually have participated in
23    the constitutional wrongdoing." Antonelli v. Sheahan, 81 F.3d 1422, 1428 (7th Cir.1996); Taylor v.
      List, 880 F.2d 1040, 1045 (9th Cir.1989) (personal participation required for finding of supervisorial
24    liability based on alleged constitutional violations).

25

26

ActUp!/Portland v. Bagley, 988 F. 2d 868, 871 (9th Cir. 1993). Answering "no" to the first part of the analysis or "yes" to the second part entitles the official to qualified immunity. Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

**A.   No defendant subjected Spangler to conditions that amounted to unconstitutional punishment.**

The 14th Amendment applies to Spangler's complaints about jail conditions.[3] Ingraham v. Wright, 430 U.S. 651, 671-672, n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). It protects pretrial detainees against the use of excessive force that amounts to punishment. Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir.1998). To constitute punishment, the action must cause the detainee to suffer some harm or disability, and the purpose of the action must be to punish the detainee. Demery v. Arpaio, 378 F.3d 1020,1029 (9th Cir.2004) (citing Bell v. Wolfish, 441 U.S. 520, 538, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). The harm must either significantly exceed or be independent of the inherent discomforts of confinement. Demery, 378 F.3d at 1030. If a condition or governmental action is not reasonably related to a legitimate governmental objective – "if it is arbitrary or purposeless" – a court may infer that the purpose of the governmental action is punishment. Bell, 441 U.S. at 539.

Under applicable 8th Amendment standards, deprivations must deny a minimal civilized measure of life's necessities to establish a violation, Johnson v. Lewis, 217 F.3d 726, 731 (9th

---

[3]Spangler does not allege any facts that establish violations under Article 4, sec. 2 or the 5th or 8th Amendments. The 8th Amendment, which applies to convicted inmates, could not have been violated because Spangler was a pretrial detainee until May 4, 2011, the date a judgment was entered and he was transferred to prison. Decl. Kiesser, ex. 1. See City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) ("Eighth Amendment scrutiny is appropriate only after the state has secured a formal adjudication of guilt.")

Motion for Summary
Judgment: C12-1196-RAJ-JPD

3

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

Cir.2000), such as "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." Rhodes v. Chapman, 452 U.S. 337, 348, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Where the conditions of confinement are at issue the:

> "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment.... conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."

Rhodes v. Chapman, 452 U.S. at 347.

In determining whether a violation has occurred, a court should consider the circumstances, nature, and duration of a deprivation of these necessities. Johnson, 217 F.3d at 731. Mere negligence is insufficient to establish liability. Farmer, 511 U.S. at 835; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998); see also Daniels v. Williams, 474 U.S. 327, 330-32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). To sustain a claim, an inmate must prove that the deprivation occurred through deliberate indifference. Wilson v. Seiter, 501 U.S. 294, 302-03, 111 S.Ct. 2321, 2326-27, 115 L.Ed.2d 271 (1991). Officials are deliberately indifferent if they both know of and disregard an excessive risk to inmate health. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. Frost v. Agnos, 152 F.3d at 1128. Thus, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

There is no liability if the prison official lacked knowledge of the risk or presents evidence of a reasonable, albeit unsuccessful, response to the risk. Farmer, 511 U.S. at 844–45. "[T]he relevant inquiry is not whether, in hindsight, [the officer] acted unreasonably, but

Motion for Summary
Judgment: C12-1196-RAJ-JPD

4

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

1    instead whether his decision was reasonable in light of the information that he possessed at the

2    time of implementation." Rudebusch v. Hughes, 313 F.3d 506, 519 (9th Cir.2002).

3        **1.    Spangler did not suffer any harm because his alleged headaches were pre-**

4        **existing and not caused by any punishment.**

5        Spangler alleges he suffered "constant migraines & backpain" because of

6    overcrowding; noisy inmates; constant lights; housing in C-pod and Gray cells; and use of

7    waist chains. Doc. 33-1.

8        However, Spangler's alleged migraines pre-existed his detention. In January 2010,

9    Spangler wrote, "I have a history of migraines . . . I used street drugs to help with it." Decl.

10   Coakley, ex. 1. On February 1, 2011, Spangler claimed "I have chronic migraines" and

11   identified medications that had he used elsewhere. Decl. Coakley, ex. 2, 3 ("Since my fall it

12   hasn't gotten any better.") Spangler has also attributed his "condition" to hunger, Decl.

13   Coakley, ex. 4, the stress of defending himself, Decl. Kiesser, ex.2; and his suicide attempt.

14   Decl. Coakley, ex. 5, Doc. 20-1 at 293. Medical staff determined that Spangler's complaints

15   were part of an effort to receive controlled drugs. Decl. Coakley, ex. 1 ("Headaches are often a

16   manifestation of subacute drug withdrawal. No controlled drugs."); ex. 3.[4] Medical staff also

17   observed:

18        claims constant head ache and pain for weeks – but behavior belies that
         statement. Behavioral issues apparent attempts to appeal "mental." Was in
19        a fight several days ago.

20

21   _____

22   [4] Between September 1and November 5, 2011, Spangler shot and smoked "black," heroin daily. Decl.
23   Coakley, ex. 6. Medical staff diagnosed Spangler as suffering from drug induced paranoia, in addition
     to other psychological problems, and treated him cautiously. Decl. Coakley, ex. 7, 8, 9 (Spangler
24   requested Suboxone, a drug used to treat opiate addiction.)

25

26

Decl. Coakley, ex. 10.[5]

**2.      Jail noise did not contribute to Spangler's alleged condition.**

Spangler alleges that noise from "mentally handicapped" inmates in C-pod and booking area noise – when housed in a gray cell – was unconstitutional punishment. Doc. 33-1 at 2 (screaming and yelling from mentally ill inmates caused him to "bang to get them to stop after a few nights" and caused a loss of "sleep for days on end."); Doc. 33-1 at 3 (noise from booking area made sleep impossible.)

An allegation of excessive noise coupled with a claim of injury can state a sec. 1983 claim. Williams v. Boles, 841 F.2d 181, 183 (7th Cir.1988) (infliction of incessant noise, even if it causes only agony and not enduring injury, may be a due process violation). However, a few hours of periodic loud noises do not pose a serious risk of injury. Lunsford v. Bennett, 17 F.3d 1574, 1580 (7th Cir.1994). An unrelenting din would be required. Toussaint v. McCarthy, 597 F.Supp. 1388, 1397, 1410 (N.D.Cal.1984) *aff'd in part, rev'd in part on other grounds,* 801 F.2d 1080, 1110 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); Inmates of Occoquan v. Barry, 844 F.2d 828, 848 (D.C.Cir.1988) (An excessive noise claim, such as one caused by unregulated television volume settings, would constitute a constitutional violation only in combination with numerous other systemic deficiencies, including testimony that it was "necessary to almost shout to be heard.")

_____

[5] Spangler does not allege – and no evidence would support – that any specific defendant failed to forward his requests for medical care to the jail's medical staff or that he did not get competent medical care. For example, he admits that he was medically treated after his "fall," Doc. 20-1 at 35, from his bunk. Doc. 33-1 at 4 ("I was concussed & received stiches.") He also praised "Vaun [Von LaQuet] for bein the best med assist. ever." Decl. Coakley, ex. 11.

Motion for Summary
Judgment: C12-1196-RAJ-JPD

6

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

C-pod, which Spangler refers to as the "hole," is normally one of the quieter housing areas in the jail. It is not densely populated, has ten cells on two tiers and lacks a television. Inmates are only allowed out of their cells singly, not as a group. Decl. Coakley. This eliminates the usual sources of jail noise. It also establishes that Spangler is complaining about noise that he caused or acerbated. For example, during 2012, one inmate exhibited mental issues that caused him to yell for short periods of time. Decl. Wend. Spangler admits that he added to the noise, Doc. 33-1 at 2, and the Jail Log recorded his role:

> On 3/4/11 while dealing with a suicidal inmate in C-pod, I/M Spangler, Bryce (NN#220164) was yelling at the inmate, saying "kill yourself you pussy," "just end it all." I told Spangler to be quiet twice, however he continued to do it. When I was done dealing with the suicidal inmate, I went back to C-pod and asked Spangler why he was making things worse? He stated I had no proof it was him. I told him I knew it was him, but asked him if he was denying it. He started laughing and said, "I'm pleading the fifth." I told him I did not find his comments helpful or funny, and he would be losing his hour out today 3/4/11. North Control notified.

Doc. 20-1 at 48. On January 31, 2012:

> While observing dinner service from North Control, yelling & banging could be heard coming from Cpod. Due to its excess & being directed at a mentally unstable inmate, [ ], I advised all Cpod inmates via the overhead speaker to stop or they may lose visiting, commissary, or more. The yelling & banging then escalated & I could see doors rattling. I went room-by-room via the intercoms & could hear the yelling continuing from C1 (Spangler NN220164), C2 [ ], C4 [ ] & C8 [ ]. These are single-occupant cells, so there was no discprepancies as to who was causing the riotous activity. Deputies Andersen & Ruddell responded to Cpod. Two trays hit the floor. Deputy Ruddell verified the trays belonged to Spangler & [ ]. There was still yelling when I left on break at 1710. It had calmed down upon my return at 1740.

Doc. 20-1 at 143. Spangler did not restrict his harassment to yelling. He was also a central figure in general noisemaking. For example, on March 8, 2011, he harassed another inmate by dumping mop-bucket water under his cell door. Doc. 20-1 at 52. On February 23, 2012,

Motion for Summary
Judgment: C12-1196-RAJ-JPD

7

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

Spangler banged on his cell door so hard that the control panel showed that the door was open. Doc. 20-1 at 166.

Spangler explained his actions as an effort to establish his cred:

> I/M Spangler stated he does not want to be locked down with a bunch of "rapos' and he had to make a display and be drug out of C-pod to show the other inmates that he was not happy and wanting to stay in a rapo pod. This is all due to the fact that several inmates were moved from D-pod to C-pod.
>
> I/M Spangler stated he has tried to be good and feels he is doing better but is afraid that if he did not make a show of things he would get beat up if he was ever housed in population once inmates saw that he was housed with sex offenders.

Doc. 20-1 at 181. Clearly, Spangler had no difficulty communicating with other inmates and staff.[6] His noisemaking simply served to – in his eyes – elevate his status among inmates. Further, in the two instances where Spangler complained about noise that was caused by other inmates, his remedies were granted. Decl. Coakley, ex. 12, 13.

**3.      Screening, jail cleanliness, and "things like that" did not harm Spangler.**

Spangler alleges:

> In the hole we (the other pro se inmates & I) were housed with inmates who were sociopathic, schizophrenic & mentally disturbed they scream yell bang on metal toilets & doors flood the tiers w/unsanitary toilet water & throw out sanitary napkins on the tier poop in the showers & other things like that.

Doc. 33-1 at 2.

---

[6] See Doc. 20-1 at 197 ("At 1725 hours Spangler again called me in North Control and stated his demands and added several more nonsense things. He asked for females to be brought over from other pods.")

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

C-pod, which Spangler refers to as the "hole," is neither a "Black hole of Calcutta" nor a Hilton Express. C-pod consists of ten cells, five on each of two levels, with a shower on each level. Inmates are locked down twenty-three hours of the day, but are allowed to access the dayroom, showers, and cleaning supplies during their time out of their cells. This intensive management allows for the heightened security needed to house violent inmates and inmates sanctioned to disciplinary segregation, such as Spangler. It also allows for the security needed to house pro se defendants because it provides the only area in the jail, other than isolation, where the materials that are allowed for the use of pro se inmates, such as pens, carbon paper, metal fittings, and hardbound books, which would be considered contraband and dangerous in general population, can be allowed. Decl. Wend.

Spangler's complaint exaggerates or fabricates conditions in C- pod. For example, his frequent requests to be housed in C-pod belie his characterization of C-pod as a "hole." He twice sought to be housed in C-Pod upon being booked into the jail, Doc. 20-1 at 90, 113; fought a move from C-pod to general population, Doc. 20-1 at 100; and requested to stay in C-pod, after serving time on disciplinary segregation, to "stay out of trouble." Doc. 20-1 at 105.

Further, there is no evidence – and no defendant is aware – that Spangler ever complained about sanitary napkins or "poop" in C-pod. Sanitary napkins are only given – not sold – to female inmates, who have no physical contact with male inmates in C-pod. Deputy Hines, who walked though C-pod during his hourly rounds, never saw a sanitary napkin or found "poop" in a C-pod shower. Decl. Hines.

Spangler never complained about toilets flooding C-pod either. Decl. defendants. Toilets do not flood because of poor maintenance. Decl. Kitchener. They flood because inmates purposefully plug and flush the toilets with the intent to flood their cells and pods, Decl. Coakley, an activity that Spangler enjoyed. See Doc. 20-1 at 228 ("I glanced into C-8 and observed I/M Spangler wearing only his red jail pants and dancing around his overflowing

Motion for Summary
Judgment: C12-1196-RAJ-JPD

9

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

toilet laughing.") Spangler either led, participating in, or encouraged every flooding incident that took place in C-pod while he was housed there.[7]

Contrary to Spangler's allegation, the jail does classify inmates, with care being taken to identify persons who posed a risk of violence against other inmates. Decl. Coakley. Classification does not mean that Spangler would not be housed with persons he did not like. Simply because of his threats and acts of violence against jail staff Spangler could have been permanently housed in C-pod; however, an additional combination of valid penological reasons and needs supported the decision to house Spangler in C-pod: his history of rules violations;[8] necessary and progressive discipline for his increasingly violent threats[9] and

[7] Doc. 20-1 at 7 (3/20/08) (Spangler encouraged other inmates to flood cells in C-pod);  at 16 (10/27/08) (Spangler flooded cell and C-pod because he had been moved to a different cell after breaking a window); at 26 (2/9/09) (Spangler flooded his cell in C-pod);  at 55 (3/14/11) (Spangler placed wet paper over shower drain and refused to lock down);  at 57 (3/14/11) (Spangler stated "They shut all the water off! Now we can't flood or nothing"); at 71 (5/13/11) (Spangler threatened flooding); at 107 (8/15/11) (Water to Spangler's cell was turned off after water seen coming from his cell and turned on after Spangler agreed not to flood cell);  at 130 (11/17/11) (Spangler stated "that he was not going to flood that he is just [going] to TEE OFF on the officer"); at 150 (1/26/12) (Spangler "stated he would not flood but that he wanted a pro se phone call"); at 195 (3/30/12) (Spangler floods his cell and C-pod); at 222 (4/1/12) (Spangler "admitted to the flooding stating he was 'dinging out' knowing that he was going to be on lock down again"); at 228 (4/6/12) (Spangler told that flooding cell to protest move to another cell was not a good idea); at 243 (4/23/12) (Spangler encourages inmates to flood and floods his cell and C-pod).

[8] Spangler arrived at the Skagit County jail on December 21, 2010, with an established reputation for defiance and insubordination. Between January 30, 2008 and April 1, 2008, he was involved in ten disciplinary issues, Doc. 20-1 at 13, including being associated with flooding, at 4, attempted flooding, at 5; self-report of not getting along with anyone, at 6; flooding, at 7; and shredding toilet paper, at 8. Between October 21, 2008 and November 4, 2008, he was involved in rioting, at 14; breaking windows and fixtures, flooding, and noncompliance with orders, contraband, threats to staff and display of weapon, at 15-20; and pizza demand/hunger strike, at 22. Between January 4, 2009 and February 10, 2009 he threatened to kill his roommate and flooded his cell, at 26.

[9] Doc. 20-1 at 166 ("I/M Spangler was very upset saying to Deputy Parker 'that fat bitch is stupid, I hate that bitch and everytime I am around that bitch I get a major infraction. I am gonna cut that fat bitches throat.' Deputy Parker said to I/M Spangler 'you dont want to say something like that'. I/M

Motion for Summary
Judgment: C12-1196-RAJ-JPD

10

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

1  assaults on staff; his several requests for C-pod housing; and the security needed for pro se

2  inmates. Decl. Coakley, Wend. Further, Spangler has described himself as the exact sort of

3  person that (1) he complained about being housed with and (2) needed to be housed away from

4  other inmates: "I am diagnosed bi polar/manic depressive/sociopathic/AdHD PTSD &

5  Neurotic Anxiety by 3 different doctors & possibly schitzofrenic." Decl. Coakley, ex. 14; 15

6  ("I fight tattoo & extort ppl not T.P. pods or draw on clothes").

7       Spangler was not punished by being housed with violent and noisy inmates. He was the

8  violent and noisy inmate. In other words, Spangler sought to be the rotten apple in C-pod. In

9  contrast to Spangler's nearly constant misbehavior, a pro se defendant facing life imprisonment

10  if convicted of aggravated murder spent his time diligently working on his defense rather than

11  trying to prove his bona fides as a hardened con as Spangler did. Decl. Coakley.

12       That Spangler voluntarily flooded his cell and otherwise acted out to protest being

13  housed near persons he found objectionable are not grounds for a constitutional violation.

14  There is no allegation or evidence that any defendant was responsible for or tolerated the

15  conditions that Spangler either created or made up or that Spangler was exposed to any

16  influences more violent than himself.

17

18

19

20

21

22  ————————————————

23

24  Spangler replied with 'listen I know myself and iv been in the hole long enough and I will do something to that bitch if I get the opportunity.'")

25

26

Motion for Summary                                    11                   PROSECUTING ATTORNEY
Judgment: C12-1196-RAJ-JPD                                                        OF SKAGIT COUNTY
                                                                                   605 South Third Street
                                                                              Mt. Vernon, Washington 98273
                                                                                       360-336-9460

1     **4.    Spangler's three short stays in the Gray cells were not cruel and unusual.**

2     Spangler alleges lengthy and "disgusting & debasing" stays in Gray 9 and 13 in April

3 and May of 2012.[10] Doc. 33-1 at 2-3. However, the detentions were neither lengthy nor

4 debasing and were imposed for sound penological reasons.

5     The use of a "Chinese cell" in which there is no bedding, no light and no toilet facilities

6 save a hole in the floor is a violation when used for indefinite housing, used as a threat to

7 inmates to mend their ways, and imposed randomly, including after acquittal of a jail assault.

8 Kirby v. Blackledge, 530 F.2d 583, 586 (4th Cir. 1976); *see also* Bienvenu v. Beauregard

9 Parish Police Jury, 705 F.2d 1457, 1460 (5th Cir.1983) (allegation that defendant intentionally

10 subjected prisoner to "cold, rainy, roach-infested facility and furnished him with inoperative,

11 scum-encrusted washing and toilet facilities sufficiently alleges a cause of action cognizable

12 under 42 U.S.C. § 1983 and the eighth and fourteenth amendments."); Gates v. Collier, 501

13 F.2d 1291 (5th Cir.1974) (The Eighth Amendment is violated where naked prisoner was placed

14 in small, unclean cell without light, hygienic material, bedding, or adequate food, and where

15 prisoner was not allowed to wash himself.)

16     However, temporary deprivations do not necessarily establish cruel and unusual

17 punishment. Harris v. Flemming, 839 F.2d 1232, 1235–36 (7th Cir.1988) (no constitutional

18 violation where prison officials failed to provide inmate with toilet paper for five days, and

19 soap, toothbrush and toothpaste for ten days); Hutto v. Finney, 437 U.S. 678, 98 S. Ct. 2565,

20 57 L. Ed. 2d 522 (1978) ("A filthy, overcrowded cell and a diet of 'grue[l]' might be tolerable

21

22 ─────────────────

23

24 [10] Spangler alleges that he was confined in Gray 13 for a week in April and May, 2012, Doc. 33-1 at 2; and in Gray 9 "for a month in May of 2012." Doc. 33-1 at 3.

25

26

Motion for Summary              12                        PROSECUTING ATTORNEY
Judgment: C12-1196-RAJ-JPD                               OF SKAGIT COUNTY
                                              605 South Third Street
                                          Mt. Vernon, Washington 98273
                                             360-336-9460

1  for a few days and intolerably cruel for weeks or months."); Smith v. Copeland, 87 F.3d 265,

2  269 (8th Cir.1996) (four-day exposure to raw sewage from overflowing toilet in cell not

3  cognizable because it was a "*de minimis* imposition and thus [did] not implicate constitutional

4  concerns"); Anderson v. County of Kern, 45 F.3d 1310, 1314 (9th Cir.1995) (Eighth

5  Amendment violation cognizable where serious health hazards lasted nine months, including

6  inoperable toilets, insect infestations in stagnant pools of water and a lack of cold water when

7  temperatures were above 100 degrees).

8      a.  **The gray cells are maintained in a clean and operational condition.**

9      The jail maintains three "gray" cells in the booking area. These are used for the

10  temporary detention of incoming prisoners, suicidal inmates, and inmates who present a higher

11  risk of harm to others than can be accommodated in C-pod. Their location allows for frequent

12  observation and quick responses. Decl. Coakley.

13      Gray 9 and 11 are 6' 5" x 9' 6", one person cells with a combination toilet/sink and a 5'

14  7" x 20" bench that can be used as a bunk. Gray 13 is a 7' 6" by 9' 6" one-person cell, without

15  a bench or toilet. Gray 13 is primarily used for temporary emergency detentions and to house

16  persons on suicide watch. The toilet in Gray 13 is a grated hole in the floor, which is flushed

17  from outside the cell upon the inmate's request. Hygiene items are not usually allowed in Gray

18  13, but are often provided when a suicidal inmate is escorted to the washroom or shower. Decl.

19  Coakley.

20      The gray cells are painted in gloss paint with off-white walls, a color that readily

21  shows blood, bile, vomit, feces, etc. and facilitates cleaning. The cell doors are heavy metal

22  with a small window with a solid wood shutter, which blocks light and muffles noises from the

23  booking area. The shutter is kept closed unless a deputy needs to view an inmate. Each gray

24  cell is lit by two 32 watt soft white florescent lights from 6 a.m. to 9:30 p.m. A single 15 watt

25  "black" light is used to illuminate each cell through the night. Decl. Coakley. At a distance of

26

about three feet from the floor, the two white lights provide 28 to 30 foot-candles of light and the black light provides 0.1 lumens of light. Decl. Kitchener. The black light provides the minimum amount of light needed for jail staff to look into the cell and see how and what an inmate is doing without disturbing the inmate. Decl. Coakley.

Unless contraindicated by safety issues, inmates in the gray cells are given a clean mattress and bedding. Garbage is collected from inmates being housed in a gray cell as needed and the cells are cleaned by trustees – or jail staff – when necessary, including after an inmate has been housed in a gray cell for anything other than a transient stay such as a delay while awaiting booking. The cells are kept at normal room temperature and are not subject to crowding, infestations or drafts. The adjacent booking area, where staff wear their usual uniforms, without the need for coats and gloves, is staffed around the clock, but the noise present in the area is similar to that of an office. During the night shift, it is relatively quiet. Decl. Coakley.

No defendant has knowingly placed any inmate into a cell that is not clean. Decl. defendants. Inmates are not housed in a contaminated cell. Jail policy prohibits this. Decl. Coakley.

       b. **Valid penological reasons support Spangler's short stays in the gray cells.**

As addressed above, the slightly built, 134 pound Spangler seemed to prefer being housed in C-pod. He likely felt safer there than in general population and he tolerated disciplinary segregation fairly well or, at least, it did not cause him to make an effort to comply with jail rules. After November 10, 2011, when Spangler was accorded pro se status, the usual restrictions imposed under disciplinary segregation were mooted by the pro se privileges he received. Thereafter, Spangler enjoyed more privileges than an inmate who had never violated a jail rule even though he was on disciplinary segregation and housed in C-pod.

Motion for Summary
Judgment: C12-1196-RAJ-JPD

14

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

In effect, Spangler found that he could then harass other inmates, threaten and assault jail staff, and flood his cell and the pod without any significant increase in discipline. C-pod became Spangler's briar patch from which he could engage in increasingly violent acts as he began to realize that he was going to prison and was not able to talk the court into any further releases on his personal recognizance[11] and was not going to see his family.[12]

Spangler's increasingly violent actions left jail staff with the need to use the gray cells to address the risk of violence and suicide that Spangler presented in 2012.

The gray cells were clean and Spangler did not suffer from his short stays in them. Further, that the stays were short and followed suicidal and violent outbursts demonstrates that jail staff did not act wantonly or with an intent to arbitrarily punish Spangler. See Novak v. Beto, 453 F.2d 661 (CA5, 1971), cert. denied 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972) (punitive isolation per se is not unconstitutional).

As addressed below, Spangler's very short stays in the gray cells were justified by valid penological concerns and don't merit consideration as cruel and unusual punishment.

### (1)    Gray 13: about four and one-half hours on February 28, 2012.

Spangler was housed in Gray 13 for four and one-half hours on February 28, 2012, following his refusal to move to a different cell in C-pod. Spangler was "angry about being

---

[11] After his escape and two failures to appear (Doc. 20-1 at 68 ("Spangler had fled from PCN"), at 68 ("felony warrant booking"), at 126 ("felony warrant booking")), Spangler's requests for another release for treatment and offers to work for the task force for a plea bargain were ignored. Decl Kiesser. ex. 2, 3. Spangler's attempt to secure release by conditioning his January 20, 2012, plea on receiving a release before sentencing was denied and led to the withdrawal of his plea. Decl. Kiesser, ex. 4, 5.
[12] Spangler was highly concerned about not seeing his family, including his dying grandfather, Decl. Kiesser, ex. 6, and his soon-to-be-born daughter. Doc. 20-1 at 200; Decl. Kiesser, ex. 7.

Motion for Summary
Judgment: C12-1196-RAJ-JPD

15

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

housed near RSOs [registered sex offenders] & stated he would not be complying with lockdown orders." Spangler refused to listen to reason and four deputies, one with a Taser, were required to subdue Spangler after he took a "fighting stance," holding a "a sharp pencil taped to a toothbrush using band aids as tape." Spangler was placed in Gray 13 until he calmed down. Doc. 20-1 at 174-77.

Spangler did not complain about – and no evidence suggests that he suffered from – lighting, noise, sleeplessness, or cell cleanliness during this short detention.

        **(2)**      **Gray 13: less than three days between March 30 and April 2, 2112.**

To facilitate a suicide watch, Spangler was housed in Gray 13 from 9:36 p.m. on March 30, 2012 to 4:31 p.m. on April 2, 2012, after he was found lying on the floor of his cell, which he had barricaded with law library books, apparently unconscious with a shirt around his neck. Doc. 20-1 at 178-205. An incident report was "forwarded to Mental Health." Doc. 20-1 at 200.

Spangler primarily slept or laid down after about 10 p.m. on March 31. On April 1, he was allowed out of Gray 13 to take a shower, use the telephone, and use bathroom break. That evening he exercised, sat, read, and was allowed out to use the telephone. Decl. Coakley, ex. 16 at 10, 12; Doc. 20-1 at 205. He was again allowed out on April 2, 2012, to use the bathroom. Decl. Coakley, ex. 17.

The suicide watch ended after Spangler was observed "doing calisthenics," "laughing and singing," and acting "as though his move to Grey 13 was all a joke." Doc. 20-1 at 206. Spangler did not complain about – and no evidence suggests that he suffered from – lighting, noise, an inability to sleep or cell cleanliness.

        **(3)**      **Gray 9 and 11: less than two days from April 18 to 20, 2012.**

Upon discovery of a sharpened toothbrush taped to the bottom of his foot, Spangler was directed to wait in C-pod's dayroom while his cell was searched. Spangler tried to stop the search by arming himself with a plastic dust pan and taking a fighting stance. A deputy asked

Motion for Summary
Judgment: C12-1196-RAJ-JPD                    16                    PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

"what the problem was and he kept repeating that he was not [going] to the gray rooms." Spangler was stopped and cuffed after trying to run up the C-pod stairs to a more defensible position. Doc. 20-1 at 220. After Spangler was under control, deputies found a homemade plastic shank in Spangler's mattress. String from the unraveled mattress was wrapped around the handle to form a grip. Doc. 20-1 at 221. Spangler was placed in Gray 11 on April 18, 2012, at 1:55 p.m. for about two-and-one-half hours before being moved to Gray 9 for another forty-five hours, ending on April 20 at 12:40 p.m.[13] Doc. 20-1 at 217-24.

If there was filth in Gray 9 or 11, Spangler created it. See Doc. 20-1 at 223 (Spangler tore up his lunch, complaining "fine, if that's how its going to be ill make sure you guys have a reason to give me a sack lunch the next time I get a tray.")

Between April 19 and 20, Spangler was allowed out of Gray 9 for recreation and for two showers. He was also allowed some legal paperwork. Decl. Coakley, ex. 18. Spangler did not complain about lighting, noise, or an inability to sleep.

Spangler grieved the conditions of his confinement in Gray 9, specifically the lack of cleaning gear, but his grievance did not mention blood, urine, bile, or fecal matter. Decl. Coakley, ex. 20. Given the short duration of the detention and the reason for being housed in the gray cells – possessing and making weapons (razor head and shank) and resisting control, Doc. 20-1 at 219-22 – and his history of dissembling spray bottles, Doc. 20-1 at 67, and of using mops and dust pans as weapons, the grievance was implicitly denied. Decl. Coakley, ex. 20.

---

[13] Spangler was concurrently sanctioned to 30 days disciplinary segregation. Doc. 20-1 at 224.

Motion for Summary
Judgment: C12-1196-RAJ-JPD

17

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

1         **(4)     Gray 13: less than two days between May 2 and May 4, 2112.**

2       On April 26, 2012, Spangler pled guilty to five felonies, including prison riot,

3 intimidating a public servant, and threats to kill. Sentencing at which Spangler anticipated

4 being sentenced to sixty months in prison was set over to May 4, 2012. Decl. Kiesser, ex. 8.

5       At this time, when Spangler imminently faced being sent to prison, his concerns, which

6 had contributed to his suicide attempt on March 30, 2012, had not been resolved. Decl.

7 Coakley, ex. 20 ("I have sent numerous requests to be seen by mental health due to the fact that im

8 going through extreme mental duress & having breakdowns & extreme deppressions & manic states.")

9 Spangler was afraid of going to prison. Decl. Coakley, ex. 20. He had been under "extreme

10 mental duress" for months, Decl. Coakley, ex. 21, Decl. Kiesser, ex. 9; and had threatened

11 staff, stating, "I have mental issues & the documents supporting this[.] I will not be responsible

12 for my actions." Decl. Coakley, ex. 22 at 2. By April, his attitude had deteriorated to abject

13 defiance: "fuck you guys, I am looking at 12 years and you wanna threaten me with good time,

14 fuck you and that bitch with the stripes, I don't give a fuck." Doc. 20-1 at 210. A note found in

15 Spangler's room after the March 30, 2012 suicide attempt provided:

16         I love you Allishia & never stopped lovin you I wish I wouldve known
        my daughter but her mom never wanted me around and anyways I just
17         wanted to see my kid fuck all the jail stuff and just have a life. thank you
        fro everything Josh and Donna I love you guys & am gonna miss u guys
18         & bella the most  Mr Lonely

19

20 Doc. 20-1 at 200. Added to this stress and sense of loss, Spangler asserted that he may have contracted

21 the Aids virus and suffered from untreated Hepatitis C. Decl. Coakley, ex. 29. He also expressed a

22 concern about being isolated from his standby counsel, accusing her of undermining his defense

23 strategy causing him "to wonder if my standbye will stab me in the back at every hearing." Decl.

24 Kiesser, ex. 11.

25       On May 2, Spangler boiled over. He refused a search of his cell and person, "took a

26 fighting stance and told [a deputy] that [he] had better not be the first one in the cell because he

Motion for Summary
Judgment: C12-1196-RAJ-JPD

18

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

1  was going to punch the first person that came through the door." Deputies had to force

2  Spangler out of his cell where he was placed in a restraint chair and moved to Gray 13 at 9:44

3  p.m. Doc. 20-1 at 233-39.

4       Due to his escalation of violence, his anticipated sentencing to prison, his history of

5  suicide claims and attempts, expressions of suicide risk, denial of his attempts for another

6  release from custody, and his apparent belief that nothing more could be done to him, Jail staff

7  determined that Spangler presented a risk of violence to others and of suicide. Decl. Coakley,

8  ex. 23, 28.

9       Jail staff placed Spangler on suicide watch in Gray 13, the safest location in the jail for

10 the risk Spangler then presented. Decl. Coakley, ex.24.

11      During the suicide and violence watch, Spangler was frequently observed, Decl.

12 Coakley, ex. 23, was allowed out on May 3 for recreation, ex. 23 at 6, and to use the bathroom

13 and to take a shower. He was also allowed to use the telephone before being sentenced and

14 transferred to prison at 10:13 a.m. on May 4, 2012. Decl. Coakley ex. 24, Doc. 20-1 at 241.

15      Spangler did not complain about lighting, noise, an inability to sleep or cell cleanliness.

16  **5.    The defendants are entitled to qualified immunity.**

17      As discussed above, no jail staff ever used excessive force on Spangler. Nor did he

18 suffer a harm or disability that significantly exceeded the inherent discomfort of confinement.

19 Even his housing in the gray cells – which were of short duration or broken up by excursions to

20 recreation, the shower, bathroom or use of a telephone – did not harm Spangler. He was able to

21 sleep, Decl. defendants, did not contract any illness, was not forced to eat gruel, stand naked,

22 suffer cold, heat, or infestations, not even for a few minutes, let alone for the very few hours or

23 days he spent in any gray cell. See Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996) opinion

24 amended on denial of reh'g, 135 F.3d 1318 (9th Cir. 1998) ("the length of confinement cannot

25 be ignored in deciding whether the confinement meets constitutional standards. A filthy,

26

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months.")

Should, however, the court disagree and find that any specific defendant imposed unlawfully punished Spangler or acted with deliberate indifference to an unlawful jail condition, it should also find that the circumstances warrant granting qualified immunity to any such defendant.

Overlaying all of Spangler's allegations is the fact that he is inherently responsible for the harms he alleges. He does not have standing to complain about harms allegedly suffered by other inmates – mental inmates not being cared for, for example – especially when he acted to make those alleged harms worse. Significantly, whenever Spangler was harmed, he received appropriate treatment. Both of these factors, Spangler's actions and appropriate staff responses supported by valid concerns for the safety of Spangler, other inmates, and staff entered into Spangler's several, but short, stays in the gray cells. Significantly, there is no evidence that any defendant caused Spangler to fall, suffer headaches or back pain, or contract an illness. There is no evidence that any defendant acted indifferently to a valid complaint or an unsafe or unsanitary condition.

No precedent clearly establishes that a jail official is responsible for an inmate's allegation of injuries such as pre-existing migraines attributed to normal jail conditions or allegation of injuries incurred as a result of the inmate's own actions, including persistent violation of jail rules. Certainly, any discipline imposed, none of which Spangler challenges, was appropriate. Under all of these circumstances, a reasonable official would not have believed that any constitutional right was violated or that he or she subjected Spangler to excessive and unlawful punishment.

Motion for Summary
Judgment: C12-1196-RAJ-JPD                    20                    PROSECUTING ATTORNEY
                                                                    OF SKAGIT COUNTY
                                                                    605 South Third Street
                                                                    Mt. Vernon, Washington 98273
                                                                    360-336-9460

**B.**   **No defendant retaliated against Spangler for exercising his right to represent himself.**

Spangler alleges that he "was thrown in the hole where other inmates were housed for deciding to exercise my constitutional right under Faretta to represent myself." Doc. 33-1 at 2. Retaliation requires a showing that official actions were not only retaliatory, but without any legitimate correctional goal or without being sufficiently narrowly tailored to achieve such goals. Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir.1985).

Spangler's pre-existing and as-requested housing in C-pod necessarily precludes a finding of retaliation or punishment. After his arrest and return to jail for a failure to appear, on November 5, 2011, Spangler asked to be – and was – housed in C-pod. Doc. 20-1 at 113 ("Late report. Subject booked by SWPD and requested to go to the Hole!") It was not until five days later that Spangler sought – and was granted permission – to represent himself pro se. Doc. 20-1 at 115. [14]

Even if Spangler had not requested housing in C-Pod, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." Hewitt v. Helms, 459 U.S. 460, 468, 103 S. Ct. 864, 869, 74 L. Ed. 2d 675 (1983). Counting Spangler, there were eight pro se inmates at the jail in November 2011. Decl. Wend. All were housed in C-pod because only C-Pod provided the security needed to allow pro se defendants to possess the materials needed to conduct their defense. Such materials and supplies, which include paperclips, staples, pens,

---

[14] Spangler was again released on his personal recognizance on November 18, 2011. When he was returned to jail on January 10, 2012, following another failure to appear, he was initially housed in B-pod, but was transferred to C-pod when jail staff was advised that Spangler retained his pro se status. Doc 20-1 at 126-27.

Motion for Summary
Judgment: C12-1196-RAJ-JPD

21

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

1   etc., are considered contraband. (Metal bits can be fashioned into weapons. Carbon paper and

2   ink can be used for tattooing. All of the supplies can be used for barter, a prohibited practice.)

3   Given Spangler's history of tattooing, extortion, riot, etc., allowing him to possess such

4   materials in general population would have been unwise. Decl.Coakley.

5        Housing Spangler in C-Pod with other pro se inmates was appropriate and not

6   constitutionally unlawful. See Hewitt v. Helms, 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74

7   L.Ed.2d 675 (1983) ("[B]road discretionary authority is necessary because the administration

8   of a prison is 'at best an extraordinarily difficult undertaking[.]'") It is not punishment if a non-

9   punitive alternative may rationally be connected to the action. Bell, 441 U.S. at 538-39.

10  Certainly, no reasonable official would have believed that doing so violated the constitution.

11  **C.      No defendant unconstitutionally denied Spangler access to magazines and books.**

12        Spangler alleges that "on or around  March 2012, I kited the Sgt. of Skagit Co. Jail &

13  asked if we could have magazines sent in & received a kite back from a sgt. whos' name I

14  couldn't read stated 'we don't allow books or magazines to be sent to inmates at S.C.J.' " Doc.

15  33-1. As alleged, Spangler did not request a magazine or book. Instead, he kited about jail

16  policy:

17        I would like to know the policy on receiving outside books & publications
18        if I can order from approved vendors.

19  Decl. Coakley, ex.26.  The responding sergeant – not one of the defendants – did not deny

20  Spangler the right to order a book or magazine or refuse to give him one that he had ordered,

21  but simply stated the policy as it would apply to an inmate on disciplinary segregation:

22        At this time all books would be placed in property due to your
         disciplinary status.

23        All book that you order are subject to review, of content. No staples, not
24        hard bound. All books that are not approved will be placed in your
         property with a note to you stating the reason we did not approve the
25        book.

26

Decl. Coakley, ex. 25.

Under the jail's progressive discipline, disciplinary segregation, which entails housing in C-pod, necessarily includes a loss of privileges, such as television privileges and, with the exception of a bible, access to books and magazines. Decl. Coakley. If it did not, the discipline would likely have little effect. Although denying access to books, newspapers, and magazines can violate an inmate's constitutional rights, under the circumstances presented by Spangler's nearly constant sanction to disciplinary segregation,[15] no official would have thought that such discipline violated the law.

**D.    No defendant denied Spangler access to legal materials and mail.**

Spangler's allegations about restrictions on his access to legal mail and law books, Doc. 33-1 at 4-5, present an access to court claim, which, if they have any merit, affect the validity of his conviction. See Kirby v. Blackledge, 530 F.2d 583, 586 (4th Cir. 1976) ("the lack of adequate legal references in a prison library has been held to be a denial of access to the courts.") Thus, these allegations are barred by the court's order dismissing Spangler's access-to-the-courts claims "without prejudice," Doc. 41-2, meaning that Spangler may only raise such claims if his conviction is reversed. See Doc. 41 at 3 ("As nothing in the record suggests that his conviction has been invalidated, Mr. Spangler's access-to-the-courts claim has not yet accrued and is not cognizable in this proceeding.")

Should the court disagree, (1) there is no evidence that Spangler's legal mail was ever restricted and (2) he earned the restrictions on access to legal books though his persistent and

---

[15] Spangler was on disciplinary segregation, continuously, from February 23, 2012 until he was sentenced and transferred to the Department of Corrections on May 4, 2012. Doc. 20-1 at 160, 162, 165, 171, 174, 175-76, 176-77, 183-84, 196, 203, 260.

Motion for Summary
Judgment: C12-1196-RAJ-JPD

23

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

escalating violence and misuse of and threats of damage to law books. Decl. Coakley, ex. 26, 27; Doc. 20-1 at 196 ("Spangler also stated at that time that if we did not give in to his demands he would start "killing" the Pro Se law books. He stated that he still had standing water in his room and the books were looking like they wanted to swim like fishes.")

Jail staff was forced to find a compromise between effective disciplinary segregation and Spangler's right to defend himself after it became clear that run-of-the-mill disciplinary segregation would not curb his violence. Decl. Coakley. Under these circumstances, no jail official would have believed that the restrictions on Spangler's access to his pro se materials violated his constitutional rights.

### III.   CONCLUSION

No allegation or evidence identifies that any defendant acted with the intent or indifference required to establish any of the alleged violations of Spangler's civil rights. Further, if, under the totality of the circumstances, any allegation could possibly do so or if any evidence connected any defendant to a violation, each defendant is entitled to qualified immunity. Like any reasonable official in a similar situation, each defendant could have believed that his or her actions were founded in good jail management and did not violate any of Spangler's constitutional rights.

Spangler's complaint should be dismissed.

DATED this ___ day of _May_____, 2013.

RICHARD A. WEYRICH
SKAGIT COUNTY PROSECUTING ATTORNEY


_____
A. O. DENNY, WSBA No. 14021
Attorney for defendants

Motion for Summary
Judgment: C12-1196-RAJ-JPD

24

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

1

2

3

4

5

6

7

8

9

10

11

THE UNITED STATES DISTRICT COURT
THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

12

BRYCE L. SPANGLER,

13

        Plaintiff,

NO.  C12-1196-RAJ-JPD

14

vs.

15

[PROPOSED] ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

16

CHARLIE WEND, et al.,

17

        Defendants.

18

19

      This matter came before the Court on the defendant's motion under FRCP 56 for an

20

order granting summary judgment dismissing plaintiff Bryce Spangler's complaint. The Court

21

having considered the records and files herein, including the following:

22

     (1) Declaration of Charles Wend.

23

     (2) Declaration of Juanita O'Neill.

24

     (3) Declaration of Brian Schrader.

25

     (4) Declaration of Todd Hines.

26

     (5) Declaration of Ron Coakley, with exhibits.

[Proposed] Order: C12-1196-RAJ-JPD        1

(6) Declaration of Judy Kiesser, with exhibits.

(7) Document 20-1 filed 9/5/12.

These records and files show that there is no genuine issue as to any material fact regarding the claims stated against defendant and defendant is entitled to a summary judgment of dismissal of all claims against them as a matter of law. Now, therefore,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be and the same is hereby GRANTED, and that all claims stated against the defendants in plaintiff's Amended Complaint on file herein be and the same are hereby DISMISSED with prejudice.

DONE IN OPEN COURT this _____ day of _____, 2013.


_____
Judge

Presented by:

SKAGIT COUNTY PROSECUTING ATTORNEY

/s/ A. O. Denny

_____
A. O. Denny, WSBA 14021
Attorney for Charles Wend
605 S. 3rd St.
Mount Vernon, WA 98273
(360) 336-9460 Fax: (360) 336-9497
E-mail: arned@co.skagit.wa.us

[Proposed] Order: C12-1196-RAJ-JPD                    2

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee of Skagit County Prosecuting Attorney's Office, and is a person of such age and discretion as to be competent to serve papers.

May 3, 2013, he caused to have electronically filed:

- DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
- DECLARATION OF CHARLES WEND
- DECLARATION OF JUANITA O'NEILL
- DECLARATION OF BRIAN SCHRADER
- DECLARATION OF TODD HINES
- DECLARATION OF RON COAKLEY w/EXHIBITS
- DECLARATION OF JUDY KIESSER w/EXHIBITS
- DOCUMENT 20-1 FILED 9/5/12
- ORDER GRANTING SUMMARY JUDGMENT (PROPOSED)

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following parties/attorneys, as follows:

N/A

and which service has also been given to the Plaintiff, pro se, via U.S. Postal Service First Class Mail, also on May 3, 2013.

Bryce L. Spangler #316927
Stafford Creek Corrections Center
191 Constantine Way
Aberdeen, WA 98520

SKAGIT COUNTY PROSECUTING ATTORNEY

By s/ A.O. DENNY
A.O. DENNY, Civil Deputy
WSBA #14021
Attorney for Defendants Charlie Wend,
Todd L. Hines, Brian Schrader, & Juanita O'Neill

SKAGIT COUNTY PROSECUTING ATTORNEY
605 S. 3rd St. -- Courthouse Annex
Mount Vernon, WA 98273
Phone: (360) 336-9460
Fax: (360) 336-9497