THE UNITED STATES DISTRICT COURT
THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRYCE L. SPANGLER,

    Plaintiff,

vs.

CHARLIE WEND, et. al.,

    Defendants.

NO. C12-1196-RAJ-JPD

DECLARATION OF CHARLES WEND IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Charles Wend declares:

    I am over the age of 18 years and competent to testify regarding the matters asserted herein. I have been the Chief Corrections Deputy at the Skagit County Jail since January 1, 2011. Before that I was employed by the Washington State Department of Corrections, where I was employed for 29 years and where I had worked with inmates, probationers, and parolees. I completed the Corrections Officer Academy offered by the Washington State Criminal Justice Training Commission in 1981. Since that time, I have supervised inmates and probationers and have also attended untold hours of training courses related to inmates. I also taught a Supervising, Disciplining, and Dealing with Aggressive Behavior course at the Washington State Criminal Justice Training Commission. I am familiar with the maintenance and retrieval

Declaration of Wend:    1
C12- 1196-RAJ-JPD

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460

of records at the Skagit County Jail and with the jail's procedures regarding the security and housing of inmates.

I make the following declaration based upon my own personal knowledge:

The Skagit County Jail has five separate areas, pods, used for housing male inmates: A, B, C, D, and E. Pods A, B, and E are used for inmates who will fit into general population. D-pod is generally used for sex offenders and other inmates who are likely to be victimized in general population . C-pod is primarily used for inmates being held out of general population for disciplinary or security reasons.

Jail staff can award certain punishment for violations of jail rules which can include up to thirty days of disciplinary segregation (D-seg). Such punishment should be imposed progressively and must be appropriate for the offense. Thus, a first time minor violation should result in a minor punishment, such as lock down in a cell for a few hours or the loss of a privilege such as a weekly purchase of commissary.

Disciplinary segregation is imposed for repeat offenders and for violations of major rules, such as fighting with jail staff. It is usually served in C-pod.

While on disciplinary segregation, the inmate is allowed hygiene items, clothing, and a bible. He will be locked down 23 hours of the day and then will be allowed out to exercise and shower and make telephone calls or receive visitors, if allowed. An inmate serving time on disciplinary segregation is not allowed to possess other books or magazines. For security reasons and to accommodate the number of inmates as well as institutional needs such as inmate control, meals, clean up, etc., visitation for inmates on D-seg is restricted to a set schedule.

C-Pod has ten single use cells, five on each of two tiers. A shower is located on each tier and a day room, with a table, chair, and telephone, is located on the bottom tier. The cell doors in C-Pod are controlled by staff. Should an inmate housed in C-Pod need to be brought

from his cell for some reason, security dictates that any other inmate who is out of his cell be returned to his cell before the other inmate may be removed from his cell. This procedure is required even if the second inmate is simply being transported from his cell to another area of the jail. Inmates in C-Pod cannot open or close the doors to their cells once they have been locked into an open or closed position.

Cleaning supplies, including a mop, mop bucket, broom, and dustpan, are provided on each tier for inmates to use to clean their cells. An inmate trustee cleans the dayroom, showers, stairs, and other open areas.

Historically, inmates at the Skagit County Jail who are designated "pro se" by the superior court have been housed in C-pod. The controlled cells in C-Pod, which are separated from general population, provide the security needed to allow pro se defendants to possess materials needed to conduct their defense. Some of these materials and supplies such as carbon paper would normally be considered contraband in the jail. Ink from pens and carbon paper can be used for tattooing. All of the supplies can be and have been used for barter, a prohibited practice.

For a short time in 2011, I used one of the two cells in the Isolation area for a pro se inmate. This proved to be unworkable for several reasons. One, both isolation cells were frequently needed for inmates who truly needed to be isolated. Having a pro se inmate in one of the isolation cells prevented such use. Two, the pro se inmate who was housed in isolation took to badgering an inmate who was in isolation for mental health reasons. This essentially defeated the purpose of having an isolation area. Three, when there was more than one pro se inmate, jail routine was less disrupted when all of the pro se inmates were housed in C-pod.

When Inmate Spangler was designated as a pro se inmate, there were seven other pro se inmates already being housed in C-pod. Keeping Inmate Spangler in C-pod, where he had asked to be housed, met the jail needs to house pro se inmates together and separate from

inmates in general population. Further, Inmate Spangler is an example of a person who was frequently housed in C-Pod for disciplinary reasons. Also, after the nature of his threats and assaults on jail staff escalated in 2012, even if he had not been on disciplinary segregation, it may have been decided to house him in C-pod just because of the threat that he presented to jail staff.

Additionally, housing Inmate Spangler in general population, with access to pro se materials, would have been unwise. For example, Inmate Spangler was able to make tattooing equipment from springs removed from spray bottles provided for inmates to use to clean their pods and cells. Allowing him to have access to ink, carbon paper, and other items would have been inappropriate in general population.

I recall talking to Inmate Spangler on very few occasions. I recall in one instance that he was apologizing for his behavior, stating something to the effect of "this is just business." However, Inmate Spangler definitely presented a special problem for jail staff. He was especially volatile in that he was likely to threaten and assault inmates and staff without apparent provocation. The Jail Log reports that Inmate Spangler would become assaultive simply because he disagreed with an order to lock down, i.e., to go into his cell. Thus, the corrections deputies were advised to have a second deputy present for even routine contacts with Inmate Spangler.

After Inmate Spangler was designated as a pro se inmate, he received many more privileges than he would have otherwise been allowed while he was on disciplinary segregation, including legal visits, telephone calls, access to law books, and storage of materials which would have otherwise been considered contraband. This appeared to negate the intended effect of disciplinary segregation. Certainly, as Inmate Spangler approached his plea and sentencing, his actions became more unpredictable and violent. Jail deputies were advised that Inmate Spangler would be a two-person detail and that they should be cautious

when working with him. This caution and a deputy's observation that a razor was missing caused staff to search Inmate Spangler's cell and discover that he had hidden a jail-made shank in his mattress.

The discovery of the shank necessitated daily searches and an effort to separate Inmate Spangler from items that could be used or developed as weapons. Thus, Sgt. Randall and Sgt. Coakley imposed a regimen that established the intended effect of disciplinary segregation. Inmate Spangler was held to disciplinary segregation standards while in his cell and was allowed access to his pro se materials and books in one of the interview rooms in the booking area. The separation necessitated searches, but it effectively ensured that Inmate Spangler would not be able to introduce weapons into any interaction with jail staff or inmates.

Inmate Spangler has been one of the most disruptive inmates during my tenure at the Skagit County jail. He has accumulated as many or more disciplinary actions than any other inmate during that time. Most inmates seek to serve their time by staying out of trouble and preserving good time. This would lead to an earlier release. Inmate Spangler in contrast, seemed to take pride in violating rules, presenting violence, and being disciplined. Between December 10, 2010 and May 4, 2012, he earned no good time. Just before he was sentenced and transferred to the state prison, he incurred an additional thirty days of disciplinary segregation. In fact, since Inmate Spangler's transfer to the State Department of Corrections, he has been housed in Intensive Management Units, units reserved for inmates with behavior management issues.

Beginning in late 2011, after he was designated pro se, it appeared that the certainty of conviction and his going to prison (where he would be a small fish in a big pond) and the certainty of not obtaining a temporary release to see his family began to have an adverse effect on Inmate Spangler's behavior.

I do not recall Inmate Spangler ever asking for magazines. I certainly did not prevent him from ordering or receiving any magazines. Nor am I aware that he ever sought to have a magazine provided to him or that anyone ever prevented him from ordering a magazine or book. I am not aware that Inmate Spangler ever tried to order any books or magazines beyond the legal materials he requested and obtained from the county Law Library. I believe that Inmate Mr. Spangler received multiple copies of Prison Legal News while confined in the jail. This periodical came gratis to the jail, as Inmate Spangler rarely had funds in his inmate account with which to make purchases of any kind.

Of course, while Inmate Spangler was subject to disciplinary segregation, which from jail records was a lot of the time, he would not have been allowed to possess any magazines or books other than a bible. The exception to this rule arose when Inmate Spangler was granted pro se status by the superior court. A pro se inmate, an inmate who is defending himself against pending criminal charges such as Inmate Spangler was after November 10, 2011, is allowed access to law books and other materials.

The jail log, Doc. 20-1, a contemporaneous record of jail events, shows that Inmate Spangler's misbehavior escalated after January 10, 2012. Inmate Spangler was returned to jail under a felony bench warrant following his second release on personal recognizance. Jail records show that he returned with significant drug issues and no longer had benefit of being represented by an assigned defense counsel. Between January and May, 2012, Inmate Spangler's behavior grew progressively worse. He also expressed concerns about not being able to see his family. He expected a daughter to be born in July and said that his grandfather was dying. On top of that, disciplinary segregation had little to no effect on his behavior. Inmate Spangler's pro se status effectively negated the impact of disciplinary segregation. He was allowed to have book, pens, paper, carbon paper, legal visits, legal calls, etc.  some of which he would not have been allowed otherwise.

Based on my experience, the days before an inmate is sentenced to prison, as Inmate Spangler expected to be for sixty months, a heightened risk of suicide for inmates is often presented. Inmate Spangler already had one suicide attempt in 2012, and was caught with a homemade shank in his cell in mid-April, 2012. More ominously, Inmate Spangler did not seem to care enough to control his behavior. Further, he fit a pattern of indicators that suggested a heightened risk of suicide.

I did not make the decision to place Inmate Spangler in Gray 13 on May 2, 2012, but find that there was sufficient reason to believe that Inmate Spangler presented a significant risk of self-harm that could not be ignored. At a minimum, the risk that he presented to jail staff required more intense observation than could be given in C-pod. Gray 13 is Spartan. However, it is the only location in the jail that allows for the constant supervision of suicidal inmates, that provides a physical environment that greatly minimizes the opportunity for an inmate to commit self-harm, and that provides for a rapid response should there be a suicide attempt.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge.

Dated this 26th day of April, 2013, at Mount Vernon, Washington.

_____
CHARLES WEND

Declaration of Wend:                7
C12- 1196-RAJ-JPD

PROSECUTING ATTORNEY
OF SKAGIT COUNTY
605 South Third Street
Mt. Vernon, Washington 98273
360-336-9460